693 P.2d 987

**STATE of Arizona, Appellee,**

v.

**Kenneth Allen CLARK, Appellant.**

**No. 1 CA–CR 7392.**

Court of Appeals of Arizona,
Division 1, Department B.

Dec. 24, 1984.

As Amended Dec. 27, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel Criminal Div., Gerald R. Grant, Asst. Atty. Gen., Phoenix, for appellee.

, Garth Nelson, Parker, for appellant.

KLEINSCHMIDT, Judge.

Appellant Kenneth Allen Clark, was charged with two counts of aggravated assault, first-degree burglary, attempted armed robbery and misconduct involving a weapon. The burglary charge was dismissed. After trial to a jury, appellant was found guilty of the four remaining counts. The aggravated assaults and attempted armed robbery were found to be dangerous offenses by the jury. Appellant moved for new trial, on the basis that the state failed to properly serve subpoenas for witnesses requested by the defense. His motion was denied after an evidentiary hearing. Appellant was sentenced to 7.5 years, the presumptive term on the aggravated assault and attempted armed robbery convic-

tions, and to 1.5 years for the misconduct involving a weapon conviction.

The basic facts of the case are as follows. At about 4:00 a.m. on January 22, 1983, Donald Frank, a nightwatchman at a Texaco Station near Ehrenberg, Arizona, noticed a person who appeared and disappeared several times around the station. Frank went to the station owner, Paul Flannagan who was in the office of the station, and told him what he had seen. Frank obtained a pistol and the two proceeded to search the premises. Flannagan entered the men's restroom and encountered the appellant, masked, gloved, and pointing a sawed-off shotgun at him. Flannagan ran out, calling to Frank that appellant had a gun. Appellant emerged from the restroom, pointing the shotgun at Frank. Frank shot first, wounding appellant who collapsed in the doorway of the men's restroom. A deputy sheriff was called and arrived to find the appellant still lying by the restroom doorway. Appellant told the deputy he had been rabbit hunting prior to entering the restroom.

Appellant's first argument is that the trial court erred in denying his motion for judgment of acquittal on the charge of attempted armed robbery. Appellant's argument is that the evidence will not support the conclusion that he undertook any overt act toward the commission of the crime of attempted armed robbery beyond the point of mere preparation.

 In determining whether or not there was sufficient evidence of an "overt act," we view the evidence and inferences therefrom in the light most favorable to sustaining the verdict. *State v. Hall,* 129 Ariz. 589, 633 P.2d 398 (1981). A.R.S. § 13–1001(A), defines attempt, in relevant part, as:

A person commits attempt if, acting with the kind of culpability otherwise required for commission of an offense, such person...

2. Intentionally does ... anything which, under the circumstances as such person believes them to be, is any step in a course of conduct planned to culminate in commission of an offense.

The trial court instructed the jury in accordance with the above statute. The essential elements of an attempted robbery are (1) intent to commit robbery and (2) an overt act towards that commission. *State v. Pittman,* 118 Ariz. 71, 574 P.2d 1290 (1978). In determining whether a defendant is guilty of attempted robbery, the court must examine the particular facts in each case to determine whether the defendant's acts have advanced beyond the stage of mere preparation. *State v. Dale,* 121 Ariz. 433, 590 P.2d 1379 (1979). The fundamental reason behind the requirement of an overt act in an attempt case is that until such acts occur, there is too much uncertainty as to whether the design is actually to be carried out. *State v. Wilson,* 120 Ariz. 72, 584 P.2d 53 (App.1978).

The evidence of the necessary overt act is as follows. Donald Frank had observed the appellant appear and disappear around the corner of the restroom building several times. This activity persisted for 30–40 minutes. No customers were at the station. The time was 3:30 a.m. Surprised by Flannagan in the restroom, the appellant pointed the gun at him. The appellant was wearing a stocking cap with eye holes cut in it pulled down over his face and he wore gloves on his hands. As he left the restroom, he encountered Frank, who testified that appellant pointed the shotgun at him. Appellant's gun was an illegal sawed-off shotgun. The weapon was fully operable and a shell was in the chamber ready to fire. An expert witness, Richard Beaudry, from the State of Arizona Game and Fish Department, testified that it is not typical to hunt rabbits with a sawed-off shotgun and that one so hunting is not likely to kill a rabbit.

 While it is true that the Arizona cases cited by appellant all involve some statement by the defendant to the victim indicating an intent to rob the victim, no such statement is necessary for the commission of the crime of attempted robbery. All that is required is an overt act. The

above actions were sufficient steps in a course of conduct planned to culminate in a robbery. We conclude that the actions were sufficient to prove the "overt act" requirement of the crime of attempted armed robbery.

Although we have found no cases with similar facts in Arizona, our reasoning is supported by several opinions from other jurisdictions. In *People v. Burleson*, 50 Ill.App.3d 629, 8 Ill.Dec. 776, 365 N.E.2d 1162 (App.1977), the defendant and his accomplice did not enter the bank building, which was their alleged target, but they were in possession of a shotgun, a suitcase and were wearing disguises consisting of nylon stockings and stocking caps. The duo was scared away and shortly thereafter arrested. The court found that the defendants' acts constituted a "substantial step" toward the commission of an armed robbery of the bank. 50 Ill.App.3d at 633, 8 Ill.Dec. at 780, 365 N.E.2d at 1166.

In *People v. Vizcarra*, 110 Cal.App.3d 858, 168 Cal.Rptr. 257 (App.1980), the defendant approached a liquor store with a rifle and attempted to hide on a pathway immediately adjacent to the store when observed by a customer. The court found this to be a "sufficient direct act toward the accomplishment of the robbery." 110 Cal.App.3d at 862, 168 Cal.Rptr. at 259. The court stated:

> It is sufficient that the overt acts reach far enough for the accomplishment of the offense to amount to the '*commencement* of its consummation'. [Emphasis in original.]

110 Cal.App.3d at 862, 168 Cal.Rptr. at 259.

In *State v. Ward*, 601 S.W.2d 629 (Mo. App.1980), the defendant's acts consisted of going up to the door of the motel office, while masked, with shotgun in hand and with a getaway car waiting. The court stated:

> An overt criminal act is one going beyond mere preparation and done after and in furtherance of a prior plan to commit a crime.... We agree with the

trial court's conclusion that overt acts were shown.

601 S.W.2d at 630.

We find no basis to distinguish the above cases. We conclude that the trial court did not err in denying appellant's motion for judgment of acquittal.

Appellant's second argument is that he was "effectively denied his constitutional right to compulsory process to secure the attendance of witnesses of his choosing to testify on his behalf." Appellant argues that the state did not show good faith and due diligence in serving subpoenas to witnesses desired by the defense.

■ Both the United States and Arizona Constitutions provide that the accused in all criminal prosecutions shall have the right to have compulsory process issue to obtain witnesses in his favor. U.S. Const. amend VI; Ariz. Const. art. II, § 24. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the United States Supreme Court stated that the right to compulsory process was a fundamental basis of due process because it goes to the defendant's right to present his version of the facts so that the jury may decide the truth.

■ One aspect of the right to compulsory process is the state's role in serving a subpoena. A.R.S. § 13–4072(F) provides:

> A peace officer shall serve in his county any subpoena delivered to him for service, either on behalf of this state or the defendant.

The statute does not say what efforts must be made to effect service or what a peace officer should do if he cannot achieve service. No Arizona opinions have construed the duty of the peace officer under this statute. The United States Court of Appeals for the Ninth Circuit, however, in *Maguire v. United States*, 396 F.2d 327 (9th Cir.1968) explained:

> The Sixth Amendment does not require that the government be successful in trying to subpoena witnesses—all that is required is that the process issue and the Marshal exercise due diligence in a good

faith attempt to secure service of the process.

396 F.2d at 330. *Accord, United States v. Bolden,* 461 F.2d 998 (8th Cir.1972); *Elam v. State,* 50 Wis.2d 383, 184 N.W.2d 176 (1971). *See also* 97 C.J.S. *Witnesses* § 13, at 360. We agree with this principle of law. The authorities, however, do not provide a great deal of guidance as to how the principle applies to a particular set of facts.

The record shows that subpoenas were issued by the clerk of the court on June 14, 1983, to compel the attendance at trial of witnesses Rick Steinmetz, Murphy Morgan, and Lonny Timmons. Defense counsel's secretary, Judy Scrivener, testified that the subpoenas were transported to the La Paz County Sheriff's Office that same day. The subpoenas were returned as "wholly unserved" on June 20, 1983, for the reason that the officer was "unable to locate [the witnesses] in the Ehrenberg area to effect service."

Trial began on June 21, 1983. The defense first presented the absence of the three witnesses as an issue during a break in the state's case in chief. Defense counsel stated at that time that he did not know what had happened to the subpoenas. The defense requested that the court take a recess so that the appellant could accompany a sheriff's deputy to Ehrenberg to find the three witnesses and to have them subpoenaed. The trial court denied the motion because of the failure of the defense to show that the witnesses were available and the failure to show that the sheriff's officer "did not make diligent efforts to contact them."

After the state rested its case, defense counsel related to the court that he had determined the subpoenas had been returned unserved. He further stated that the appellant's father was going to locate the witnesses. Upon the court's request that the prosecutor explain what efforts had been made to serve the subpoenas, the prosecutor related that the subpoenas had been delivered to Deputy Tracy Self on June 13, 1984. The prosecutor avowed that Deputy Self told him that Self had made "extensive efforts to find these individuals." Deputy Self also indicated he had looked in the area behind the Texaco station where the defense had said at least two of the three witnesses had been located.

The trial court gave the defense an additional day, "in order that we can attempt to locate these witnesses." The primary effort to locate was to be made through defendant's father, but the court told defense counsel, "if you need any assistance from the La Paz County Sheriff's Department in locating these witnesses, please advise the Court." The court also affirmed, for the record, that it was obvious that the continuance "[was] not a result of any malfeasance on the part of the State in serving subpoenas."

The appellant then took the stand and told his story. In the course thereof, he testified that he expected some of his friends to testify, and that Lonny Timmons would testify that appellant gave him the rabbits appellant had killed on the night of the incident.

On June 22, 1983, trial resumed. The parties stipulated that the state could proceed with rebuttal, but since the defense expected the witnesses "this morning," it reserved the right to call witnesses out of order after rebuttal. After the state's rebuttal, the witnesses still had not shown up. The defense put appellant on the stand, out of the presence of the jury, to testify as to the defense efforts to contact the witnesses. Appellant's mother had contacted Carl Dutton who told her that he might be at trial. Carl Dutton was supposed to contact the three subpoenaed witnesses if he could. Dutton himself would supposedly have testified that he had dropped the appellant off earlier in the evening near the area of the station so that he could hunt rabbits.

The prosecution stated it had checked with Lieutenant Newman of the sheriff's office, who stated the subpoenas had been turned over to Deputy Self on June 14, 1983. Self had told Newman that Timmons and Morgan, whom Self knew, left the area

two to three months earlier and had not been seen in the area since. Self made no further efforts to locate Timmons and Morgan. In searching for Steinmetz, the officers checked with the post office for a box number and with the electric company for a possible account address, but both investigations were futile. Also, Jessie Warren, of the sheriff's office, told Lieutenant Newman that on June 17, 1983, he had contacted defense counsel's secretary and told her there was a "lack of any servable addresses on these three particular men." The sheriff's office never received other addresses for the witnesses from the defense.

After defense counsel told the court where he thought the three subpoenaed witnesses could be found, the court stated:

[Y]esterday when we recessed early in the afternoon, the Court gave Defendant an opportunity to provide further instructions on how to locate and serve these persons and chose not to do that, thoroughly indicating to the Court that [he] wished to attempt to locate these witnesses by his own means, through his relatives; and I think we've given him a fair opportunity to do that.

The defense put the appellant on the stand before the jury one last time, at which time appellant explained the efforts to contact the three subpoenaed witnesses and Dutton.

After the jury rendered its verdict, appellant made a motion for new trial, primarily based on the sheriff's failure to serve the subpoenas. A hearing was held on August 9, 1983. Appellant testified as to the testimony expected from Steinmetz, Morgan, Timmons, and Dutton. He related that he had been told that Dutton did not make it to the trial because he could not get the time off work. Defense counsel's secretary testified that she had contacted the sheriff's office on both June 17 and 20, 1983, and that on each occasion the sheriff's office could not tell her if the subpoenas had been served. She testified she told the sheriff's office to advise her if they could not be served. For the state, Deputy Imhoff testified that Self had said that Morgan and Timmons "[were] gone." Lieutenant Newman testified for the defense that he had no trouble finding Steinmetz after the trial. Officer Self did not testify.

The trial court denied the motion for new trial stating that (1) the state had made diligent efforts to serve the subpoenas; and (2) on June 21, 1983, the appellant had chosen not to further avail himself of the state's help in locating witnesses and had taken it upon his own to locate them.

■ The trial court's ruling is sufficiently supported by the record. First, the defense cannot claim that the state breached any duty to serve Dutton for the reason Dutton was never subpoenaed. As to Morgan and Timmons, Self stated that they had been gone from the county for at least two months. Appellant never advised the sheriff's office that Morgan and Timmons had moved to Phoenix. At the hearing on the motion for new trial Self testified that he had repeatedly requested that the sheriff allow him access to his wallet where he had a current address for Morgan and Timmons. The record is not clear as to whether these requests were made before trial. The trial record, which contains much about efforts to locate these witnesses, reflects nothing about addresses contained in the wallet or requests for access to the wallet. In any event, the appellant did have access to the wallet before the hearing on the motion for new trial and, according to him, he was able to contact the two witnesses. The hearing date had been changed from August 8 to August 9 and the appellant testified that he had heard that they had showed up for the hearing on the 8th and he hoped they would be present to testify. The witnesses, who were not subpoenaed, did not appear. Under all the circumstances the trial judge could well have disbelieved the appellant's account of his efforts to secure the presence of the witnesses.

As to Steinmetz, the deputy checked for a post office box, and for electrical hook-up records. Although Steinmetz was found later, the record is unclear as to how the

officer who ultimately located him knew where he was. Given the secondary nature of his proposed testimony as to what Frank could or could not have seen from his residence, we doubt that his presence at trial would have had any impact on the verdict. Although on June 17, 1983, the sheriff's office advised the defense counsel's secretary that the subpoenas could not be served as addressed, no further addresses were supplied.

Further, on June 21, 1983, during trial, the appellant assumed the responsibility for locating witnesses. He never advised the court or the sheriff's office that he needed further help. It is significant that the alleged witnesses did not even show up at the hearing on the motion for new trial, after Newman had been able to contact Steinmetz, and after appellant had Phoenix addresses for Morgan and Timmons. We conclude that there was no error in the trial court's finding that the state acted with due diligence in attempting to serve the subpoenas.

▮ We do not make light of the sheriff's duty to diligently serve subpoenas for the defense. We are aware that officers may naturally be tempted to exercise less effort on behalf of criminal defendants than is required. It is the duty of the courts to be certain that this does not occur. We will not assume, however, that the sheriff's office did not do its duty. Here, the record not only supports the conclusion that it did its duty but suggests that the appellant himself was none too anxious to command the appearance of the witnesses.

For the foregoing reasons, the judgment and sentence are affirmed.

GREER and FROEB, JJ., concur.